UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELLE LINDHOLM, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL J. ASTRUE, COMMISSIONER, ) <br> SOCIAL SECURITY ADMINISTRATION, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 10-11935-DJC |

MEMORANDUM AND ORDER

CASPER, J.                                                                                                February 16, 2012

I.    Introduction

Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner") contends that Plaintiff Michelle Lindholm ("Lindholm") was overpaid disability insurance benefits ("SSDI") for several intermittent periods from 1998 to 2005 and that she was overpaid child's insurance benefits ("CIB") received on behalf of her daughter from August 2002 through July 2005. Lindholm sought a waiver of overpayment recovery and the Commissioner denied Lindholm's request. Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Lindholm brought this action for judicial review of the final decision of the Commissioner, issued by an Administrative Law Judge ("ALJ") on April 24, 2008, and reviewed and modified by the Appeals Council on September 21, 2010. Before the Court are Lindholm's Motion to Reverse and the Commissioner's Motion to Affirm that decision. For the reasons discussed below, Lindholm's motion is GRANTED, the Commissioner's motion is DENIED

and the matter is remanded to the ALJ for a properly noticed hearing consistent with this opinion.

**II.    Facts**

   **A.    Background[1]**

      **1.    Lindholm Applies for SSDI**

Lindholm claimed an inability to work since January 15, 1996, due to her "disabling condition."[2]  R. 41.  She was 31 years old when she became unable to work.  R. 41.  On October 2, 1996, Lindholm filed a claim for SSDI with the Social Security Administration ("SSA"), R. 41-43, and on December 11, 1996, SSA granted the application with a primary diagnosis of affective disorders.  R. 44.

      **2.    Lindholm's Submission of Work Activity Reports through 1998**

On March 21, 1997, Lindholm submitted a Work Activity Report to SSA,[3] in which she reported short-term work assignments in December 1996, January 1997 and February 1997.  R. 225-27.  She reported earning more than $75.00[4] in February and March 1997.  R. 225.

On May 6, 1997, Lindholm submitted a Work Activity Report to SSA, indicating that she

---

[1]Citations to the administrative record in this case shall be to "R.___."

[2]Lindholm did not identify her "disabling condition."  R. 41-43.

[3]The Work Activity Report is a SSA form used to monitor the work and earnings of individuals who claim, among other things, SSDI.  See, e.g., R. 221-24.

[4]Lindholm signed an outdated 1985 edition of the relevant 1990 form.  R. 19.  The outdated 1985 form referred to "services" in the amount of $75.00.  In 1990, the relevant amount that qualified as "services" was actually $200.00.  Id.  "Services" include any activity done for pay or profit, or is the type which is normally done for pay or profit, even if it does not rise to the level of substantial gainful activity.  20 C.F.R. § 404.1592(b).  Substantial gainful activity "means work that (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

had worked as an infant school teacher from March 3, 1997 to April 23, 1997 and that she had earned more than $75.00 in February, March and April 1997. R. 229-32.

On May 10, 1997, SSA informed Lindholm that it had conducted a continuing disability review and determined that she was still disabled. R. 244. SSA also informed Lindholm that she had used three months of her trial work period ("TWP")[5] in February, March and April 1997. R. 244. Furthermore, the notice informed Lindholm of her duty to inform SSA immediately about any changes that might affect her benefits, including changes in work and pay. R. 245. The notice also warned Lindholm that if she did not report such information, she might have to repay any benefits that were issued to her in error. R. 245. Finally, the notice provided a detailed explanation of the TWP and extended period of eligibility ("EPE").[6]

On May 16, 1997, Lindholm submitted a Work Activity Report to SSA, indicating that she had worked as an infant school teacher from March 1, 1997 until April 23, 1997 and had earned more than $200.00 during the months of February, March and April 1997. R. 221-24.

On May 23, 1997, a representative of Massachusetts Rehabilitation completed a Report of

---

[5]The TWP is a period of time during which an individual who has been found disabled may test his or her ability to work and still be considered disabled. 20 C.F.R. § 404.1592(a). The period consists of performance of "services" during nine months, which do not need to be consecutive months, but which must occur within a period of sixty consecutive months. See id. § 404.1592(a), (e).

[6]The EPE, also called the re-entitlement period, is an additional period after the TWP during which an individual with a disabling impairment can continue to test her ability to work. Id. § 404.1592a(a). The EPE lasts for 36 continuous months following the end of the TWP. See id. § 404.1592a(b)(ii). However, if the individual performs substantial gainful activity during the EPE, SSA may find that the individual's disability has ceased and suspend payment of benefits. Id. § 404.1592a(a). If the individual stops performing substantial gainful activity during the EPE, SSA will resume payment of benefits. Id. If an individual's disability ceased during the EPE due to substantial gainful activity, her entitlement to benefits terminates the first month after the end of the EPE in which she again performed substantial gainful activity. See id. § 404.1592a(a)(3)(i).

3

Continuing Disability Interview form on Lindholm's behalf. R. 249-58. During the interview, Lindholm said she was bipolar and had mood disorders and indicated that she was seeking counseling and taking lithium as part of her treatment. R. 249-50. She also said that she was stable and functioning, had not had an "episode" since February or March 1996 and had not been told by her doctor that she could not work. R. 249.

On September 19, 1997, SSA notified Lindholm that it had found her "disability [was] continuing." R. 384. SSA also notified Lindholm that her claim would be reviewed from time to time to see if she was still eligible for benefits. R. 384. Lindholm was reminded that she must inform SSA if she returned to work, if her duties or pay had changed or if her doctor said her condition had improved. R. 385. This notice also noted that if she did not update SSA with this information, "you may have to repay any benefits you are not due." R. 385. She was notified that this information would be used to decide if her health problems continued to meet SSA's rules, if payments must be stopped because of her work or if the amount of her payment must be changed. R. 385.

On December 17, 1997, Lindholm submitted a Work Activity Report. R. 277-280. She reported that she had worked as a transcriptionist from August 21, 1997 to October 20, 1997, as a preschool teacher from February 26, 1997 to April 23, 1997, and as an office temporary from February 1996 to the date of the Work Activity Report, December 12, 1997. R. 277. She reported earning more than $75.00 in February, March, April, August, September and October 1997.

In response to SSA's request for Lindholm's wages, nine employers reported that Lindholm earned approximately $4000 in 1995, $4416.95 in 1996, $9888.91 in 1997, and $880.86 in 1998. R. 301, 305-06, 324, 330, 335-36, 341, 346, 349, 351, 356-58, 362-65.

On September 2, 1998, SSA notified Lindholm that her TWP had ended. R. 49-53. In its notice to Lindholm, SSA stated that her TWP consisted of the months November and December 1996; February, March, April, October, November and December 1997; and January 1998. R. 49. SSA also notified Lindholm that it determined her "disability [was] continuing," R. 49, but that she was required to inform SSA if she returned to work, if her duties or pay changed or if her doctor said her condition had improved. R. 50. If she failed to report these changes that might affect her benefits, this notice informed Lindholm that she "may have to repay any benefits which are not due." R. 50. SSA indicated that this information would be used to decide if her health problems continued to meet SSA's rules, if her payments must be stopped because of her work or if the amount of her payments must be changed. R. 50. The notice also included an explanation of the TWP and EPE. R. 52-53.

### 3. SSA Retroactively Discontinues SSDI Benefits for Lindholm and Seeks Reimbursement of Overpayment

On March 8, 2005, SSA notified Lindholm that it had information regarding her work and earnings, and said it "appear[ed]" SSA would discontinue her disability benefits due to her having engaged in substantial work as of October 1998. R. 54-55. In the notice, SSA advised Lindholm that she was not entitled to payments from January 1999 through December 1999 and from January 2003 onward. R. 54. SSA advised that it considered Lindholm's signed statement regarding work and earnings, SSA's earnings records, and Lindholm's work from January 1996 to December 1998, August 1998 to October 2003, and January 2004 continuing through the date of the notice. R. 54. The notice reminded Lindholm of SSA's prior notice that she had completed her TWP and indicated that her EPE which began in February 1998 had ended. R. 55-56. SSA gave her ten days to submit any additional information it should consider before making final its decision that her disability had

5

ended and that she was not entitled to payments during the specified times. R. 54.

On June 30, 2005, Lindhom was notified by SSA that it did not currently need to review her case and would not contact her doctor at that time. R. 59-60. The notice advised her to notify SSA if she returned to work, if her duties or pay changed or if her doctor indicated or found her health had improved. R. 59.

On July 6, 2005, SSA notified Lindholm that her SSDI had been suspended as of January 1999 and terminated as of January 2003 because she engaged in substantial gainful activity. R. 69-72. The notice also explained that the suspension and termination of Lindholm's SSDI caused her to receive an overpayment[7] of $23,063.50 in benefits and required her to refund this amount to SSA within 30 days. R. 69. In a separate notice, also dated July 6, 2005, SSA notified Lindholm that her daughter's CIB (that Lindholm had applied for on behalf of her daughter on December 13, 2000, R. 22) had been terminated as of January 2003, resulting in an overpayment of $4,669.00. R. 73-75.

On July 15, 2005, Lindholm filed a Request for Expedited Reinstatement of Disability Insurance Benefits, an Application for Disability Insurance Benefits and a Report of Continuing Disability Interview form. R. 259-76. In the Report of Continuing Disability Interview form, Lindholm indicated she was "bipolar." R. 267. She also reported that she had worked from September 2004 to October 2004 as an administrative assistant and from July 1998 to October 2003 as a transcriptionist. R. 271.

    **4.  Lindholm Seeks A Waiver of Overpayment Recovery from SSA**

---

[7]Overpayments are amounts paid to the beneficiary in excess of the amount due to that individual under the Social Security Act or payments resulting from the failure to suspend, reduce or terminate benefits. 20 C.F.R. § 404.501(a).

On May 5, 2006, Lindholm filed a Request for Waiver of Overpayment Recovery pertaining to the alleged overpayment of SSDI in the amount of $23,063.50. R. 81-88. She indicated that she did not realize she was exceeding the allowed income guidelines and that she was complying with the rules of her daughter's daycare and preschool, which required her to work 20-25 hours per week to maintain her daughter's place at the school. R. 82. On June 2, 2006, Lindholm filed a request to waive the alleged overpayment of CIB made for her daughter in the amount of $4,669.00. R. 89-96.

On July 11, 2006, SSA denied Lindholm's waiver requests but informed her that she had the right to appeal the denial by appearing at a personal conference scheduled for July 20, 2006. R. 97-100. Lindholm did not appear at the personal conference or request that it be rescheduled. R. 101-102. Accordingly, SSA notified Lindholm that there was no basis for changing the decision to deny her waiver request. Id.

On July 15, 2006, Lindholm submitted a Work Activity Report, indicating that she had worked as an administrative assistant from September 20, 2004 to October 26, 2004, twenty-five hours per week, earning $15.00 per hour. R. 61-68. She also reported that she had worked as a transcriptionist from July 19, 1998 to October 20, 2003, nineteen hours per week, earning $12.50 per hour. R. 62.

On July 27, 2006, SSA reaffirmed its denial of Lindholm's waiver request and informed Lindholm of her right to request a hearing before an ALJ. R. 103-04. In a separate notice, also dated July 27, 2006, Lindholm was notified that the overpayments could not be waived since there was no proof that SSA's records were incorrect. R. 366.

On July 31, 2005, SSA notified Lindholm that she would receive provisional SSDI based on her request for reinstatement for up to six months while her request was being decided. R. 76. On December 27, 2005, SSA notified Lindholm that she had been paid the provisional SSDI for six months and would not receive additional provisional payments. R. 79. On June 25, 2007, SSA notified Lindholm that she did not complete the paperwork necessary to process her request for expedited reinstatement and, therefore, her request was denied for "[f]ailure to [c]ooperate." R. 374.

### B. ALJ Hearing

#### 1. SSA Issues Notice of Hearing for "Medical Improvement"

On September 19, 2006, Lindholm submitted a request for a hearing before an administrative law judge. R. 105. In her request, she stated:

> I am financially unable to make payments; I continue to be disabled as I was in 1996 - I lost my job; in Sept. 2003 due to my condition; and I was unaware that I was going over my limit in income guidelines as no one had ever told me when I first was given disability benefits. I was told someone should have told me in 1996.

Id. Lindholm received a Notice of Hearing, dated March 23, 2007, which indicated that Lindholm's administrative hearing would address whether there had been any medical improvement in her impairment since she was last found disabled and whether one of the exceptions to medical improvement applied. R. 188-191. In a letter dated April 19, 2007, Lindholm's attorneys objected that medical improvement was not the proper issue to be considered at the hearing and asserted that the appropriate issue for consideration was whether SSA had properly terminated Lindholm's SSDI due to her performance of substantial gainful activity. R. 199-200. In an additional letter, dated April 25, 2007, the day before the scheduled hearing on medical improvement, Lindholm's attorneys

8

again stated their objections to the hearing focused on medical improvement and requested that "a hearing be scheduled to address the issue of overpayment." R. 193-94.

### 2. Testimony at the ALJ Hearing

At the beginning of the April 26, 2007 hearing, the ALJ addressed Lindholm's objections to the issues presented in the hearing notice. R. 447-48. The ALJ announced that, in light of the objections, the correct issues for the hearing were whether there had been an overpayment and if so, whether Lindholm was without fault within the meaning of the regulations, and if Lindholm was not without fault, whether she could afford to repay the overpayment. Id.; see 20 C.F.R. § 404.939 (noting that the ALJ shall make a decision on objections to the issues to be decided upon at the hearing "either in writing or at the hearing"). The ALJ did not seek Lindholm's waiver of notice of this new issue, not addressed in the notice of hearing. Although the ALJ proceeded to examine Lindholm about the prepayment issue, her counsel, a law student certified to represent Lindholm pursuant to S.J.C. Rule 3.03, indicated that they were not prepared to address the issue of overpayment. R. 457 ("I mean granted that we had whole issues with the notice and the fact that the notice was talking about medical – improvement. We didn't really know what the case was going to be about").

#### a. Lindholm's Testimony

At the administrative hearing, Lindholm testified that different SSA representatives had provided her with inconsistent information in regard to her overpayment, including that the overpayment "was because of [her] income for 2002 and 2003, that she went over the $6,000 limit" and that she should not have received benefits for any month in which she went over the allowed earnings. R. 458-59. When asked whether she filed a Work Activity Report during the time period

9

at issue, Lindholm responded: "No. I mean all of the time, all the whole time . . . I didn't do anything. I just lived . . . I was never told to do anything other than just, you know, I continued to receive my benefits . . . ." R. 468. Lindholm testified that no one told her when her earnings were exceeding an allowable amount; she simply received her benefits each month. R. 471. Lindholm further testified that she was not informed as to the date upon which her TWP or EPE benefits ended. R. 471. She explained that after her disability insurance benefits ceased in December 2005, a representative at the local SSA office advised her to file an appeal. R. 477-78. Lindholm testified that when she went to the SSA office in the summer of 2005 to file the appeal form, she was told that it would be easier to do an expedited reinstatement and request for reconsideration, which she did. R. 478. Lindholm also stated that she filed a request for waiver of overpayments in October 2005. R. 478. When she filed the request, she was informed that "Baltimore, Maryland" had lost her original file, and she was asked to complete a new application for disability insurance benefits. R. 478-79. Lindholm testified that she had received provisional benefits based on her request for reinstatement and indicated that her provisional benefits stopped "somewhere within six months," but that she never received any further correspondence regarding her request for reconsideration or reinstatement. R. 485-91. Lindholm further testified that her request for waiver of overpayments was denied in the summer of 2006, and that at some point she was told her request for reinstatement was still pending. R. 480, 491.

At the conclusion of Lindholm's hearing, the ALJ indicated his own confusion about the state of the record, R. 487, stated that he would gather the relevant facts and asked Lindholm to submit any additional information after the hearing that she thought was significant. R. 486-88. The ALJ also invited Lindholm to request another hearing if she thought the evidence warranted it. R.

492.

### b. Post-ALJ Hearing

On August 6, 2007, after the hearing at the ALJ's request, Skill Bureau, Incorporated ("Skill Bureau") reported that Lindholm earned the following amounts during her employment: $3,924.69 in 1998, $11,180.82 in 1999, $3955.88 in 2000, $1,128.25 in 2001, $8,606.00 in 2002, and $8,658.75 in 2003. R. 388-90.

### C. Findings of the ALJ

In a written decision dated April 24, 2008, the ALJ found that although the administrative hearing notice indicated the hearing would address issues related to medical improvement, it did not preclude a decision about whether Lindholm was entitled to a waiver of overpayment recovery. R. 32. Moreover, the ALJ concluded that Lindholm "has not argued that she was not prepared to proceed on the correct issue at the time of the hearing or was caught by surprise when a hearing was held on the correct issue or has not had sufficient time or opportunity to address the correct issue at the hearing." Id. Lindholm disputes this finding, contending that she was denied proper notice and, therefore, the hearing should not have gone forward on the issues related to overpayment of SSDI and CIB. Pl.'s Mem. at 8-13.

Next, the ALJ found that Lindholm's disability terminated in August 2002, that she was not entitled to SSDI or CIB benefits beginning in September 2002, and that she had been overpaid SSDI for November and December 1998, January through September 1999, November and December 1999, January through March 2000, May 2000, and September 2002 through July 2005. R. 38. The ALJ also concluded that Lindholm was overpaid CIB on her daughter's behalf for the months of September 2002 through July 2005. R. 38-39. The ALJ calculated the total overpayments to be

11

$35,569.50 in SSDI and $5,447.30 in CIB. R. 38-39. Lindholm disputes this finding, contending that the ALJ affirmed SSA's overpayment decision despite SSA's failure to meet its burden of proof. Pl.'s Mem. at 13-16.

The ALJ also determined that since his analysis of the overpayments resulted in amounts greater than those asserted by SSA in the July 2005 notice, it would be "unfair" to require Lindholm to refund overpayments which are greater than those which had been at issue and that therefore, the amounts would be as they were alleged in SSA's July 2005 notice: $23,063.50 in SSDI and $4,669 in CIB. R. 38-39, 69-75. Lindholm does not take issue with this finding.

Finally, the ALJ determined that Lindholm was not without fault in causing the overpayments and thus, was not permitted to waive the repayment. R. 39-40. Lindholm takes issue with this finding, contending that if there were overpayments, then she was without fault in receiving the overpayments and therefore, she should not have to reimburse SSA. Pl.'s Mem. at 16-19.

### D. Appeals Council Affirms ALJ Decision in Part

Lindholm filed a timely appeal of the ALJ's decision with the Appeals Council on June 19, 2008. R. 421-23. The Appeals Council affirmed the ALJ's conclusion about notice of the hearing concluding that he complied with 20 C.F.R. §404.939 that he address any objections to the notice at the hearing "and that the rationale he provided in support of his decision is reasonable." R. 10. The Appeals Council, however, modified the ALJ's decision that Lindholm was not entitled to benefits beginning in September 2002; rather, the Appeals Council found Lindholm was not entitled to benefits beginning in August 2002. R. 11. The Appeals Council also vacated the ALJ's determination of the amounts of overpayments, stating that the case should be returned to the Office of Disability Operations to calculate the overpayments based on the Appeals Council's findings.

R. 11. Finally, the Appeals Council vacated the ALJ's decision that it was "unfair" to assess overpayments in excess of the amounts previously calculated in the July 2005 notice; rather, the Appeals Council determined that the overpayments should be assessed at whatever amounts the Office of Disability Operations determined. R. 11. The Appeals Council adopted and affirmed the ALJ's findings with the aforementioned modifications. R. 9-12.

### III. Standard of Review

This Court has the power to affirm, modify, or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). Such review is limited to an evaluation of "whether there is substantial evidence to support the ALJ's fact finding and whether appropriate legal standards were employed." Jones v. Soc. Sec. Admin., 150 Fed. Appx. 1, 1-2 (1st Cir. 2005) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)). Accordingly, the ALJ's findings of fact must be affirmed when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); see also 42 U.S.C. § 405(b),(g). "It is the ALJ's prerogative to resolve conflicting evidence," Vazquez-Rosario v. Barnhart, 149 Fed. Appx. 8, 10 (1st Cir. 2005), so if substantial evidence exists to support the ALJ's decision, this Court cannot substitute its own interpretation for the ALJ's decision "even if the record arguably could justify a different conclusion." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). However, a denial of relief will not be upheld where there has been an error of law. See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). The district court reviews questions of law *de novo*. Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001).

13

**IV. Discussion**

    **A. Lindholm's Challenges to the ALJ's Findings**

Lindholm contends that the Commissioner erred by: (1) failing to serve proper notice of the overpayment of benefits as the issue to be addressed at the administrative hearing, Pl.'s Mem. at 8-13; (2) determining that there was an overpayment when SSA failed to meet its burden of proof, Pl.'s Mem. at 13-16; and (3) denying Lindholm's request for waiver of any alleged overpayment, Pl.'s Mem. at 16-19. The Court agrees with Lindholm regarding the inadequacy of the notice of the hearing and, therefore, remands this case to the ALJ for a properly noticed hearing on the merits.

        **1. Notice of the ALJ Hearing**

When an individual's property interests are at stake, procedural due process requires that the notice given to the individual is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). "Due process requires more than mere notice; rather 'meaningful notice' is required before a hearing will comport to the requirements of due process." Harris v. Callahan, 11 F. Supp. 2d 880, 884 (E.D. Tex. 1998); see Jenkerson v. Astrue, 2009 WL 1507297, at *2 (D.N.H. May 26, 2009). Under SSA regulations, a hearing notice must be sent to a claimant at least 20 days before the hearing. 20 C.F.R. § 404.938(a). The notice must include, among other requirements, "a statement of the specific issues to be decided." Id. at § 404.938(b). The claimant must notify the ALJ in writing as soon as possible before the hearing of any objections to the issues to be decided. Id. at § 404.939. The ALJ must make a decision on these objections "either in writing or at the hearing." Id. The ALJ may also "consider a new issue at the hearing if he or she notifies you and all the parties about the new issue

any time after receiving the hearing request and before mailing notice of the hearing decision." Id. at § 404.946(b)(1). Pursuant to 20 C.F.R. § 404.946(b)(2), the ALJ "shall notify [the claimant] and any other party if he or she will consider any new issue." Such "[n]otice of the time and place of the hearing on any new issues will be given in the manner described in § 404.938 [requiring, among other things, notice to "be mailed or served at least 20 days before the hearing"], unless [the claimant] ha[s] indicated in writing that [the claimant] does not wish to receive the notice." Id.; Brittingham v. Barnhart, 2003 WL 22740882, at *6 (D. Del. November 17, 2003) (citing §404.946 and concluding that "[n]ew issues may be raised without such notice, if the claimant indicates in writing that she does not wish to receive such notice"). These "regulations contemplate an applicant will receive notice and a hearing on any issues affecting the evaluation of their application." Harris, 11 F.Supp.2d at 884-85 (remanding case to ALJ where "the notice [of hearing] failed to inform [the pro se claimant] that his application might be partially denied on res judicata grounds, it was not 'meaningful' and therefore violated [the claimant's] due process rights").

Here, the Hearing Notice indicated that the administrative hearing would address whether there had been any medical improvement in Lindholm's impairment since she was last found disabled and whether one of the exceptions to medical improvement applied to her case. R. 188-91. In the initial objections on April 19, 2007, Lindholm's counsel objected to the Hearing Notice for medical improvement because they "understood that this was an overpayment case" and that her benefits were ceased for substantial work." R. 201. In their second letter a week later on April 25, 2007, her counsel reiterated their objections and requested that "a hearing be scheduled to address the issue of overpayment." R. 195-96. This second letter was sent the day before the pre-scheduled

15

ALJ hearing, but counsel's letter requested not that the hearing noticed for medical improvement be converted into a hearing on overpayment, but rather that a hearing on overpayment be set.

At the outset of the hearing, the ALJ recognized Lindholm's objections and indicated that instead of medical improvement, the hearing would focus on: (1) whether there was an overpayment, and (2) if there was an overpayment, (a) whether Lindholm was without fault, and if she was without fault, (b) whether she could afford to pay the money back. R. 447-48. Although the ALJ accepted Lindholm's objections to the originally noticed topic of medical improvement, in the absence of Lindholm's waiver of proper notice about the overpayment issue, the ALJ should have re-noticed the hearing and scheduled it for a different date and time pursuant to 20 C.F.R. § 404.946(b)(2). Cf. Brittingham, 2003 WL 22740882 at *6 (concluding that although "it is undisputed" that the notice for the hearing did not include the topic that the ALJ later addressed, there was no constitutional issue because the ALJ "expressly indicated that the hearing would not go forward unless [the claimant] agreed to waive the notice requirements" and her counsel "expressly agreed to the waiver" and the waiver was "knowing, intelligent and unconditional"). Instead, despite Lindholm's counsel's indication that he was not fully prepared to address the proper issue of overpayment since the topic of the hearing was unclear until the ALJ hearing began, and despite the ALJ's own professed concern about the record and the need to acquire the appropriate records, the ALJ proceeded to conduct a hearing on a topic that Lindholm's counsel thought was critical, but for which Lindholm was not on fair notice.

In fact, the ALJ's later conclusion that Lindholm did not argue that she was not prepared to proceed, was not caught by surprise and did not have sufficient time and opportunity to prepare, R. 32, is inconsistent with the reservations that her counsel expressed early in the hearing when the ALJ

16

began questioning Lindholm about overpayment. R. 457 (reiterating concern about lack of notice and noting that "[w]e didn't really know what the case was going to be about"); see Pl. Mem. at 5-6 ("Ms. Lindholm prepared for a hearing on the issue of medical improvement"). It is also inconsistent with counsel's post-hearing letter to the ALJ, dated May 23, 2007, in which Lindholm again objected to the improperly noticed hearing ("[d]uring the hearing on April 26, 2007 we were told this was an overpayment issue, which does not coincide with the notice of the hearing") and objects to the overpayment and the denial of the waiver and argues that "at a minimum, the proper remedy is to reinstate her benefits and at worst proceed with overpayment procedures." R. 204-06.[8]

On this record, the Court cannot conclude that Lindholm received a full and fair opportunity to argue her case and object to the proposed recovery of the overpayments. See Mullane, 339 U.S. at 314 (noting that "an elementary and fundamental requirement of due process in any proceeding

---

[8]In his decision, ALJ suggests that Lindholm changed her position after the hearing that the case was not about overpayment, but was about medical improvement and, that either way, the ALJ was entitled to address the former issue in his decision. R. 32. ALJ's characterization of these letters does not change the fact that the post-hearing letters, at base, continued to object to improperly noticed April 26th hearing upon which the ALJ relied in rendering his decision on overpayment. Similar to the May 23, 2007 letter, in later letters to the ALJ, Lindholm's counsel continued to object to the ALJ continuing to treat the hearing noticed for medical improvement as an overpayment matter and adding exhibits to that record on this issue. R. 392-93 (February 29, 2008 letter noting that "[g]iven that the notice for the hearing clearly states that this is a medical improvement case, we object that the majority of the exhibits marked seem to focus on an overpayment issue" and further arguing that there was no overpayment and the record supports waiver of any overpayment); R. 407-08 (April 10, 2008 letter reiterating objection to notice of hearing and objecting to case being treated as an overpayment matter and noting that there was no overpayment and the record supports waiver of overpayment). That Lindholm's counsel was also trying to maintain that the SSA's action was also not justified on the grounds of medical improvement–see R. 393–the topic for which the April 26th hearing was noticed–was a protective measure that was not unreasonable given the sequence of events and does not distract from Lindholm's continuing objection to the notice of the hearing.

17

. . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"). Although Lindholm answered the ALJ's questions regarding overpayment and counsel did not ask explicitly to postpone the hearing and the ALJ later took pains to reconstruct how the SSA had arrived at its overpayment decision, it cannot be said that Lindholm had a full and fair opportunity to challenge the SSA's action or the underlying reasons for same. This is particularly true where there were significant issues about how the overpayment had been calculated at the time of the ALJ hearing, R. 33 n. 15; R. 457 (Lindholm's counsel noting at the hearing that "there's nothing in the file that goes through what the overpayment . . . how it's calculated. So there's, there was all types of confusion regarding that") and the extent of Lindholm's contacts with the SSA for the purpose of determining whether she was "without fault" for her requested waiver of overpayment.[9] R. 33 n. 15. That the ALJ invited Lindholm to submit any additional evidence after the hearing that she thought was significant, R. 487-88, instructed her that if there was "a whole lot of new information," she could request an additional hearing, R. 492, and after the hearing, provided counsel with new evidence that he requested and received[10] and a draft factual chronology for review, R. 391 (noting

---

[9]The Social Security Act provides that SSA may seek recovery of amounts that were overpaid to an individual who has received more than the correct payment under title II of the Act. 20 C.F.R. § 404.501(a). However, SSA shall waive recovery of an overpayment if: (1) the recipient is found to be without fault in causing the overpayment, and (2) the recovery would defeat the purpose of the subchapter or be against equity and good conscience. 42 U.S.C. § 404(b). However, "[i]f a claimant fails to establish that he was without fault, analysis of the second prong is unnecessary." Yankun v. Barnhart, 473 F. Supp. 2d. 147, 150 (D. Mass. 2006).

[10]Certainly, an ALJ is not restricted to the record at the time of the hearing. 20 C.F.R. § 405.360 (noting that "[s]ubject to § 405.401(c), the official record closes once the [ALJ] issues his or her decision regardless of whether it becomes our final decision"); see, e.g., Davis v. Chater, 104 F.3d 361 (Table) at *3 (6th Cir. 1996) ("an ALJ may appropriately base a decision on evidence produce outside a hearing). "If the ALJ obtains evidence after the hearing from a

18

that at the April 26th hearing there were 36 exhibits, but by the ALJ's February 6, 2008 letter to counsel, there were now 76 exhibits, 3 of which were new to the record, the others having been in the file, but not marked as exhibits), 400-06 (attaching draft factual chronology for review), does not, as the Commissioner contends, suggest that Lindholm got all the process that was due. Rather, it illustrates the piecemeal manner in which Lindholm was required to litigate this case in the wake of an improperly noticed hearing for which her counsel was given inadequate time to prepare. The improperly noticed hearing was no mere technical defect in the proceeding, but rather affected Lindholm's ability to challenge the basis and amount of the overpayment and the denial of her waiver of overpayment. Accordingly, the Court cannot agree with the Commissioner's suggestion, Def. Mem. at 17 (citing Shinseki v. Sanders, 129 S.Ct. 1696, 1706 (2009)), that such error amounted to harmless error.

Accordingly, in this context and under the facts and circumstances of this case, this Court concludes that the hearing that went forward on April 26, 2007 regarding overpayment was improperly noticed and the hearing and the post-hearing events that followed denied due process to Lindholm.

### B. ALJ's Determination of Overpayment and Denial of Waiver of Overpayment

Lindholm contends that the ALJ's determination of overpayment of benefits and denial of Lindholm's request for a waiver of overpayment were not supported by substantial evidence, and, therefore, should be vacated. Pl. Mem. at 13-15, 16-19. In light of the Court's decision to remand

---

source other than the claimant, the ALJ generally must provide the claimant an opportunity to examine the evidence before entering it into the record as an exhibit." SSA Office of Disability Adjudication & Review, Hearings, Appeals & Litigation Law Manual ("HALLEX") § I-2-5-1(B). Whether such post-hearing action was permissible, however, does not resolve whether the gestalt of the process that led to the ALJ's decision constitutes due process, as discussed above.

this matter for a properly noticed hearing, the ALJ can address these issues on the merits at the rehearing and the Court need not address Lindholm's arguments about the ALJ's prior findings.

### C. The Overpayment Notices

Lindholm also contends that the SSA's overpayment notices to Lindholm were legally insufficient. Pl. Mem. at 11-13. It is not clear that Lindholm had a full opportunity to put this issue squarely before the ALJ. During the course of the hearing, Lindholm testified that she received a notice of the overpayment figure, "but it doesn't say why." R. 473-74. Lindholm's counsel follows up by telling the ALJ "[t]hat was another issue. We didn't know, we didn't know how to argue if we didn't understand where it [the overpayment figure] came from." Id. In his decision, the ALJ notes that "[t]here was no detailed explanation [in the notices to Lindholm] as to how the amounts of the overpayments were calculated." R. 24. At a minimum, SSA regulations provide that notice of overpayment must include, among other requirements, "the overpayment amount and how and when it occurred." 20 C.F.R. § 404.502a(a). At any rate, Lindholm will have the opportunity to make her argument about this issue to the ALJ upon remand.

## V. Conclusion

Based on the foregoing, the Commissioner's motion to affirm is DENIED and Lindholm's motion to reverse is GRANTED and this matter is remanded to the ALJ.

**So ordered.**

/s/ Denise J. Casper
United States District Judge